Good morning, Your Honors. If it pleases the Court, thank you for accommodating my conflict in another courtroom this morning for another oral argument. I'm Gretchen Fusilier, and I am the appellate attorney for the petitioner, Samuel E. WAULS. This case arises out of Mr. WAULS's having filed unsuccessfully in the State courts and bringing a Federal petition for writ of habeas corpus in the Federal District Court, claiming that his Sixth and Fourteenth Amendment rights had been violated when, during his jury trial, an audiotaped statement by one of the witnesses for the prosecution had been submitted to the jury to listen to in the absence of Mr. WAULS and in the absence of his attorney. The clearly established Federal law that we are relying on has been established by Snyder v. Massachusetts and other U.S. Supreme Court cases, which have referenced a standard of determining what are the critical stages of a trial. In Snyder v. Massachusetts and in Kentucky v. Stenser, as well as Russian v. Spain, which we have all cited in our briefs, his presence is required when it is reasonably substantial to the fullness of his opportunity to defend himself against the charges. In this particular case, there were no eyewitnesses to the shooting for which Mr. WAULS was accused and convicted. Sinise Love, however, had been in the automobile that Mr. WAULS was driving over to the scene of the Tiki apartments where the victim was shot and killed. Another person was in the car and Ms. Love, she did come in under subpoena by the District Attorney's Office and testified to a litany of I don't remember answers. Because of her either deliberate evasiveness of not remembering or her lack of memory for any other reason, the District Attorney did play an audio, a portion of an audio tape statement that she had given to Police Officer McLean at the Pomona Police Station, I believe it was. In that audio taped statement, well the audio taped statement was not part of the record in the federal habeas corpus petition. So we don't know what the content of that statement was. The statements that were on that recording played to the jury during the trial was not recorded by the court reporter. So it's not recorded and memorialized in any form for the record on this appeal. What you know though is that Ms. Love's statement was fairly lengthy, correct? We don't know how long. And there's statements in the colloquy between the judge and counsel that the judge was going to have playback, just a small part. It was an edited portion of the complete audio tape statement. And just before it was given to the two counsel, before it was sent back into the jury room, the judge asked the lawyers to listen to the tape, correct? To listen. And to confirm that what was on that tape was the same thing that was played in the courtroom. Isn't that right? That's correct, Your Honor. That's correct. However, our argument is somewhat two-fold. One, the violation for his failure to be present during the playback. What would his presence have added to the play? Well, our position is because... But aren't they agreed? You're talking about the playback of the tape itself? Yes, that's correct, Your Honor. Not the readback. No, we are not. He did not raise the readback. He raised in his state and his federal... So before the tape went into the jury room, the lawyers had agreed, they'd listened to it, and they confirmed to the judge that it was the same thing that had been played in the courtroom when she testified. That's correct. Had he been present at the time they sent it back in, what would his presence have done? Well, Your Honor, we believe that... What would it have added to that proceeding? We believe that because the record is so void of the circumstances surrounding Sinise Loves giving the audiotaped statement first of all to the officer at the Pomona Police Department, part of our argument on appeal is that there was a violation of his Sixth Amendment confrontation right by the mere admission of the... I have an issue from Judge Pius's question, which is what difference would it have made if he'd been present for the playback? He was present for the testimony, which included the playing of the tape. Yes. And as we indicated in our brief, although the attorneys had listened to a portion of the taped audio statement that had been played during the trial, the record is void of any indication whether or not that was on a reel of tape or cassette tape that included other matters, or if it included various other parts of Sinise Loves' statement. But how about the audio? You said it was identical. I mean, as the kids would say, what part of identical is there to understand? Your Honor, I would agree except for the fact that although the judge had, the court had asked the defense attorney and the deputy D.H. to listen to the part that was played for the jury. That they did. Nothing in the record indicates that that portion had been lifted from another master tape and put onto a segregated tape that had nothing else on it. We heard that the. It does look like that her testimony, though, or her statement that she gave was fairly lengthy. And all that was at issue was just one part of her statement. Isn't that correct? Your Honor, I don't think the record. And the D.A. makes reference that he wants to play just a part of the tape. I don't think, at least I don't, I did not see anything in the record that led me to conclude how long or lengthy the audio tape statement of Sinise Love was. There is information in the record that there were audio taped statements by other people. Cumulatively, those tapes were presumably lengthy. There was a tape by his mother, I believe by his grandmother, by other people. But as far as determining definitively the length of Sinise Love's statement, I don't think the record reflects that. Let me put the question somewhat differently. Sure, he's entitled to be present at a critical stage. The Supreme Court's never said that a readback, never mind playback, is a critical stage. Counsel knew that the tape was going to be played back, and so did the defendant. They were both there when it was discussed. Neither one said, I want to be there. So presence wasn't really denied. It just didn't happen. So how is the resolution contrary to clearly established Supreme Court law? Your Honor, it appears as though this playback from the language and the request by the prosecutor, the prosecutor indicated to the court when he asked to reopen for the specific purpose of admitting this audio taped statement, that it had not been recorded, unbeknownst to both the defense attorney and the prosecutor. And the prosecutor characterized this state, this audio taped statement, as part and parcel of the readback testimony of Sinise Love earlier. She couldn't remember, so they played the tape to augment her memory or as a prior inconsistent statement. If we look at the clerk's transcripts, when the initial readback was given to the, or provided to the jury, the clerk transcript does not indicate, first of all, that the request for readback was that of Sinise Love. It does not reflect that the attorneys were advised that there was going to be a readback so they could request presence. And if this is a continuation, once one part of in-trial testimony has been presented, it seems as though the audio taped readback presents, although it was not raised before, the same type of issue relating to the due process under the Sixth Amendment, Fourteenth Amendment, that he was not able to determine if that alone was the additional part presented to the jury. In essence, this was testimony provided to the jury, and that is indicated in U.S. Supreme Court cases, if testimony is provided to a jury, as a critical stage of the trial. And as we argued, it's our position that this audio taped statement played at that point in time. First of all, we don't know when exactly it was played. We know that the jury requested it if we look at the clerk's transcripts of October the 11th of 1989, but the transcript does not say they retired to the deliberation room and listened to the tape. The only thing it says is that it was requested. We now go to the clerk's transcripts of October the 12th, and we show that they resumed deliberation about 9.15 in the morning and had a verdict somewhere around noon. So, yes, the defense attorney knew that they had listened to it. They had signed off on that it was the same that they had listened to that was played in court, but we still don't have a record reflecting that this was the only audio on the tape that was provided to the jury. If the petitioner or his attorney had had an opportunity to assist or be present at this playback, they would have been able to perhaps preserve some issue for appeal that they were not able to do because of their absence, and they would have been able to know if that was the only additional tape that was played for the jury. Although on the issue of the admissibility of that tape, there is obviously the legal position that the prior inconsistent statement in which the people of the State of California characterized her audio tape statement as in order to get it admitted. If it were a prior inconsistent statement, yes, it would have been admissible, provided that she was at trial and subject to full cross-examination. Now, the admissibility of the tape as such is not an exhausted issue nor an issue that is certified. Is that right? Yes, Your Honor, it was certified. What? This Court certified. Everything in the tape? Yes, Your Honor. This Court certified three issues. The first one was whether appellants' Federal constitutional rights were violated. I'm sorry. I beg your pardon. You're absolutely correct. It was certified. What I'm saying is it wasn't exhausted. So what's the basis for it to have been certified? I mean, it's not an exhausted issue. It wasn't raised in State court, was it? It was raised below, Your Honor, as I recall. State court? Before the California Supreme Court? It was raised in the State federal habeas – I mean, in the State habeas corpus. It was alluded to. Okay. Alluded and raised are slightly different. It was at the appellant's excerpts of record, page 9, 10, 11. Well, he does not raise it as an individual claim. However, it was mentioned in arguments below. Counsel, I'd like you to address one of the uncertified issues, which was the claim that counsel had a conflict  Yes, Your Honor. Mr. Walz brought Marsden motion, which is in the State of California, a motion that a defendant is – has standing to bring if they feel there is some conflict of interest in order to discharge an attorney and obtain substitute counsel. That motion was denied. Our position is that his attorney failed to represent that he was simultaneously, not at any time before or some subsequent time, but simultaneously representing the relative of the victim in this case. And although there may be – we don't know definitively whether there was a compromise that his attorney made in the representation of Mr. Walz, but there was the perception of a conflict of interest. When did Mr. Walz learn that his trial counsel had appreciated this other brother-in-law, whoever it was? Mr. Walz claims that there was a failure to conduct investigation. My question is, when did he learn? When did this idea that he was – that the counsel, trial counsel, was representing? I believe he learned after the fact, Your Honor. After the trial? Is my understanding. Your Honor, excuse me. He learned during the trial that his attorney was representing simultaneously. Did he bring that to the judge's attention? Yes. Did he bring the Marsden motions? He brought several. In the second Marsden motion, the trial judge asked if anything happened since the previous one that was new. And he indicated no, but there had been very – there had been foul language. There had been expletives in the interviews and conversations that his attorney had with him. And he felt that because of this, he was subjected to an attorney who was not representing his best interest. And then exactly when did he find out that the lawyer was representing the victim's brother? Your Honor, I don't know in a definitive timeframe, period of time, when he found out. He did find it out prior to going to trial, is my recollection. And he brought one Marsden motion that was denied, and he subsequently brought a second one. At the second one, it was a perfunctory type of a hearing because the trial judge did not believe that any new information had been provided or had arisen to create a circumstance different from what had previously been heard. When did the judge first know about it? The judge knew about it when the Marsden motion was brought. And it was in that motion? Yes. That was – that was the – that was the focus of the motion. Did you say it was the issue of whether the representation of Rabbit ran afoul of Sixth Amendment rights raised in the Federal habeas petition in the district court? On this particular issue, Your Honor, or on the previous one? I don't know that he couched it in terms of Sixth Amendment. I don't think he did. So if he didn't, then we can't consider it, can we? Your Honor, I raised it in this brief as an uncertified issue on appeal. Well, no, but I mean, if it's not raised in the district court, then it's really not debatable that we could resolve it differently, could we? Well, there is case law, Your Honor, and I don't have the case citation that indicates that if there is a constitutional issue that was not raised below for judicial economy, it could be addressed on appeal with other relevant issues. Okay. Unless there are additional questions, I'll submit it. All right. Thank you. Thank you. We will now hear from Mr. Carlin. Good morning, Your Honors. May I please have the floor? Louis Carlin for Respondent. Just to take the COA issue first, with regard to the admissibility of the tape itself, I think that the issue is really not so much exhaustion, although that is an important consideration, it's prior to that. That issue is not in the petition. We have the right to presence claim in the petition. We don't have an admissibility of evidence due process claim in the petition. So it's not the usual case where you say, well — In the state court petition or in the federal petition? In either, but certainly not in the federal petition. Now, because it's not in the state court, I would order — I would argue an exhaustion, but I didn't argue an exhaustion because it's not in the federal petition. I see. So there's nothing to go back and exhaust yet. There has to be that claim in the petition. Now, I think the reason it came up in the COA is it's the same transaction, essentially. So you can make that argument, and maybe it's a good one, but it isn't one petitioner has ever made. It's not one that anyone in the district court thought was at issue. You know, it's like making a Romero motion and not making an Eighth Amendment argument. Same facts. You could make the same argument out of both, but they're separate claims. And the same analysis that this Court has used, a very strict analysis, in its exhaustion cases would say, no, you really have to identify your claims. And looking at this claim, the right-to-presence claim, you can't say that there was a separate challenge of admissibility of evidence. Going back to the beginning of counsel's argument, I believe there was eyewitness testimony as to the shooting. Ms. Gillespie testified. Again, this is similar to the Sinise Love testimony. She denied at trial seeing Petitioner fire the five shots. She said she only saw the five shots hit. But at the preliminary hearing, when she was subject to cross-examination, she testified she saw the murder take place. She was impeached with that prior inconsistent statement, and under California law, prior inconsistent statements are admissible for their truth. There was eyewitness testimony as to the murder. The mention was also made of whether counsel had an opportunity to assert his right to be present. Yes. The district court found so expressly, and that's at ER 100. And he had every basis for saying so. Well, I guess the test would be if, in fact, presence is necessary, then you would have to have an eyewitness testimony. If you have a waiver, you wouldn't have to. So I think you have to show that it wasn't necessary that they'd be present. Well, actually, I think the analysis would go the other way around. First, you'd have to find that it was a critical stage of trial at the time of this trial. And as this Court has already held in La Crosse v. Kernan, no court no – the Supreme Court has never so held. So there was no – there was no Supreme Court law. I was asking the question in a different way. When I said it was necessary, what I'm saying to you was, was it a critical stage at which he was required to be present? And in that case, you'd have to have a waiver. If the Supreme Court had held. So, yes, correct. And so I think that what's instructive here, and I cited it in my brief, is the seminal case on right to presence, the Snyder case, the Justice Cardozo opinion. And that wasn't talking about audio tape playback or even readback. It was talking about right to attend a show, a field show. I'm blanking. Where you go to the scene of the crime. Exactly. And the Court held that that was not a – they didn't use the phrase critical stage, but they found no due process violation. And it was very interesting. The Court said counsel never objected to this and never asserted his right to be there. And Justice Cardozo held that that – he called that a – gave a sense by acquiescence. So because there is no established right to be present, and because there is no finding that this is a critical stage, no formal waiver was required and that you can waive by acquiescence, as Justice Cardozo wrote for the Court way back when the right to presence was first recognized. It is clear that counsel at least twice for both parties verified that this was exactly what was played to the jury and was admitted. So this is not a situation in which evidence was admitted after close of evidence that wasn't previously admitted. This is really a technicality in the clearest sense. The jury heard the tape. The prosecutor failed to ask that the court reporter be relieved of her obligation to report. Nevertheless, it was not reported. And so when the jury said we want to hear Sinise Love's testimony, and it was all read back, it took about 20 minutes in the morning on August – excuse me, October 11th. And I just do – I want to apologize to the Court. In my brief, I cited – I gave the date as August 1st. It's October 11th, I wrote in my brief. I made that mistake. But anyway, that is when you sort of dig through the minute orders, it's the October 11th minute order, and it's very clear. And there's no difficulty in reconstructing the record. You look at the minute order of August 11th. You read the transcript. They fit pretty well within minutes that what happened was morning read back of Sinise Love's testimony. Later on, a request by the jury to explain the premeditation instruction. The court consults with counsel. At that point, counsel says, you know, when they read back the Love testimony, they didn't have a chance to hear the audio tape. You should give them the audio tape. The counsel says, wait a minute, I object. They didn't ask for it. The court says, well, I'm not going to force it on them. I'll just let them know it's available. They bring back the jury, instruct on premeditation, and the judge says, by the way, there was that audio tape playback. I don't know if you want to hear it or not, but if you do, we have it. Subsequently, the jury asked to hear it. Another colloquy with counsel in the presence of Petitioner. And that is where the audio tape was admitted. And it must have been given to the jury after that. That's the only way to understand this. Whether they actually listened to it or not, who knows. But, of course, if they didn't listen to it, then there's no prejudice. And that's another reason why prejudice is pure speculation in this case. And review of Fisher v. Roe is incredibly illuminating on this. The court there faced such a different situation. In Fisher v. Roe, the jury asked to hear everything bearing on the sequence of events of the crime. They didn't identify whose testimony they want to hear. Tremendous amount of discretion. There was a defense case, lots of witnesses by prosecution and defense. Without counsel's knowledge, the court or the court reporter on its own chose what to read. As this court held in Fisher v. Roe, that's very different. In such a situation, counsel can make a difference. They can say, look. How did we define the right there? How did we define the right, the Supreme Court right that was at stake there? Well, I think, unfortunately, the court used a rationale that's been seriously challenged. The court used the analysis in Van Tran that the Supreme Court has thrown out. And then it used the unreasonable failure to extend language that the court criticized in the recent Alvarado case. So the court said, well, the Supreme Court has never held that this is a critical stage. But we think under these circumstances it would be extended. Whether this court would make the same ruling post-Alvarado and post the discrediting of Van Tran, I don't know. It really doesn't much matter, does it? Because are we asking what the U.S. Supreme Court has done? Well, exactly. And so I think the way you understand Fisher v. Roe is just a straight due process case, just like it was Snyder v. Massachusetts. Was this a situation in which denial of the right to presence really made it so that this defendant could not have had a fair trial? I think that's what ultimately the Ninth Circuit held in Fisher v. Roe. And so that's why it is important to distinguish the case. The district court did it ably. It did it quickly. But if you look at Fisher v. Roe, you'll see he did it extremely correctly. The cases are so different. Counsel could have made a difference in Fisher. This is a situation where you have audio playback of an edited portion of a tape that was played to the jury, was admitted. Counsel twice stipulated that it was accurate. This is completing a person's testimony. You know, again, in Fisher v. Roe said this was — and this is on page 915. The court said the jury did not simply ask to hear the testimony of a single witness or to have a few isolated facts verified. Well, that's what we have here. We have even less than that. This is not a situation in which prejudice can be found at all. And if — I think that's about it. I have to say I'm not really prepared to argue the uncertified issues. But if the district court resolved that pretty handily — I mean, it's a pretty simple rule that the uncertified issues can be briefed. They can be briefed, but they cannot be — they cannot be resolved absent the opportunity of the opposing party to — to brief them. Well, these were briefed in the case, were they not? I'm referring particularly to the question of a possible conflict of counsel. Right. But it's my understanding that the circuit rules say that we have to be given the opportunity, and we were not given the opportunity. Well, you have to brief. No, I'm not saying that, Your Honor. Under the rules, you don't have to brief. Exactly. There's been no order. And I'm referring to 9th Circuit Rule 22-1, sub F. Yes. If you would like briefing, I'd be happy to give it to you. We'll let you know if we do. Thanks so much, Your Honor. All right. I think you had a few seconds left. Did you want to say anything further? Yes, just — thank you. Just briefly, Your Honors. In looking at the reporter's transcript, Ms. Gillespie, who the government indicates was an eyewitness, she was present, but her testimony clearly indicated that she did not see Mr. Walls shoot the victim. And in response to the question of the basis for Fisher v. Rose holding, whether or not it held a constitutional component to its holding, that decision did indicate that Fisher had a right to be involved in and present at the readback of their absence. And if their absence could have undermined the fairness of the proceedings, then it would have been a violation. It is indisputable that their absence and that of their attorneys greatly increased the risk of prejudice. The Fisher court went on to indicate, because the record was so void of circumstances surrounding the readback, that it was remanded, and they could not — they held that the denial and the dismissal of the habeas corpus petition was an unreasonable application of U.S. Supreme Court law. Thank you very much. Counsel, the matter just argued will be submitted, and the Court will take a brief recess. All rise. This court will stand at recess until 5 p.m.
judges: B Fletcher, Rymer, Paez